FAX or Internet

UNITED STATES DISTRICT COURT

for the

District of Arizona

In the Matter of the Search of

**Ryan Matthew Fisher, a/k/a/ Ryan Matthew Swick, an Indian male, born in 1988**

)
)
)
)

Case No.   21-4302mb

### ELECTRONICALLY ISSUED SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer.

An electronic application by a federal law enforcement officer for the government requests the search of the following person or property located in the _____ District of   Arizona _____
*(identify the person or describe the property to be searched and give its location)*:  **See Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:  **See Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before     October 12, 2021
*(not to exceed 14 days)*

[X] in the daytime  6:00 a.m. to 10 p.m.          [ ] at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the search warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a search warrant copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
   __Any U.S. Magistrate Judge in the D. of Arizona__ .
                                   *(Name)*

[ ] I find that immediate notification may have an adverse result as specified in 18 U.S.C. § 3103a  (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  [ ] for _____ days *(not to exceed 30).*
                                   [ ] until, the facts justifying, the later specific date of _____ .

Date and Time Issued: _____       **Camille D. Bibles** Digitally signed by Camille D. Bibles
                                                          Date: 2021.09.28 13:27:31 -07'00'
                                               _____
                                                          *Judge's Signature*

City and State:   Flagstaff, Arizona           Camille D. Bibles,  United States Magistrate Judge

| Return | | |
|---|---|---|
| Case No.: 21-4302mb | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing Officer's Signature*

_____
*Printed Name and Title*

## ATTACHMENT A

## DESCRIPTION OF PERSON TO BE SEARCHED

Ryan Matthew Fisher (Fisher), a/k/a Ryan Matthew Swick, an Indian male who is approximately 5'6" tall and weighs approximately 168 pounds.   Fisher has brown hair and brown eyes.   The last four numbers of Fisher's Social Security Number are 8886, and his date of birth is in 1988.

As of September 24, 2021, Fisher was in the custody of the United States Marshals Service and was being held at the Central Arizona Detention Center in Florence, Arizona in the District of Arizona.

## ATTACHMENT B

### THINGS TO BE SEARCHED FOR AND SEIZED

Evidence in the form of a deoxyribonucleic acid (DNA) standards to be obtained from Ryan Matthew Fisher, a/k/a Ryan Matthew Swick, collected by means of cotton/buccal swabs (2) from the inside of his mouth (i.e., cheek area).

FAX or Internet

# UNITED STATES DISTRICT COURT

for the
District of Arizona

In the Matter of the Search of:

**Ryan Matthew Fisher, a/k/a/ Ryan Matthew
Swick, an Indian male, born in 1988**

)
)
)
)

Case No.   21-4302mb

(Original To Be Filed With Court)

## ELECTRONIC APPLICATION FOR SEARCH WARRANT

    I, the undersigned, a federal law enforcement officer, request an electronic search warrant and state under penalty of perjury that I have reason to believe that on and within the following person or property:
    **See Attachment A.**
located in the _____ District of _____ Arizona _____ , there is now concealed:
    **See Attachment B.**
The basis for the search under Fed. R. Crim. P. 41(c) is:

[X] evidence of a crime;

[ ] contraband, fruits of crime, or other items illegally possessed;

[ ] property designed for use, intended for use, or used in committing a crime;

[ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Sections* | *Offense Descriptions* |
|---|---|
| 18 U.S.C. 922(g)(1) | Felon in Possession of a Firearm |
| 26 U.S.C. 5861(d) and 5871 | Possession of an Unregistered Weapon made from a Shotgun |

The application is based upon the following facts:

[X] Continued on the attached sheet (see attached **Affidavit**).

[ ] Delayed notice of _____ days (give exact ending date if more than 30 days) days:
    is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by: */s AUSA Paul V. Stearns*
**Pursuant to 28 U.S.C. §1746(2), I declare under penalty
of perjury that the foregoing is true and correct.**
Executed on 9|28|2021

_____
*Applicant's Signature*

   X    Sworn by Telephone

Elliott M. White, Special Agent, FBI
*Printed Name and Title*

Date/
Time: _____

Camille D.
Bibles

Digitally signed by Camille D.
Bibles
Date: 2021.09.28 13:28:01
-07'00'

_____
*Judge's Signature*

City and State:  Flagstaff, Arizona

Camille D. Bibles , United States Magistrate Judge
*Printed Name and Title*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

**ELECTRONICALLY SUBMITTED AFFIDAVIT**

I, <u>FBI Special Agent Elliott M. White</u>, state under oath as follows:

1.      Your affiant is employed as a Special Agent (SA) of the Federal Bureau of Investigation (FBI), and he has been so employed since April 2015.   Your affiant has more than 17 years of experience as a sworn law enforcement officer both military and federal.   Your affiant is currently assigned to the FBI Phoenix Division, Lake Havasu City Resident Agency, and he is charged with the investigation of crimes occurring on (among other places) the Colorado River Indian Tribes (CRIT) Reservation.   Your affiant's duties include the investigation of federal crimes occurring within Indian Country within the District of Arizona.

2.      The information contained in this affidavit is based upon your affiant's personal knowledge, training, experience, as well as information provided by other law enforcement officers and witnesses including those listed herein.   Your affiant has not included every fact known to him concerning this investigation.   Your affiant has set forth only the facts necessary to establish probable cause to support issuance of the requested search warrant.

**Background/Introduction**

3.      This case involves an investigation of unlawful possession of firearms by Ryan Matthew Fisher (Fisher), a/k/a Ryan Matthew Swick, a person prohibited

1

from possessing a firearm due to a previous conviction of a crime punishable by imprisonment for a term exceeding one year. The incident occurred in Parker, Arizona, on the CRIT Indian Reservation in the District of Arizona.

4.      On or about November 10, 2020, a federal grand jury in the District of Arizona returned a true bill charging Fisher with two counts of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of Possession of an Unregistered Weapon made from a Shotgun, in violation of 26 U.S.C. §§ 5861(d) and 5871.   The Case Number in this matter is 20-CR-00775.[1] This matter is currently set for a firm trial in the District of Arizona on November 17, 2021.

5.      In short, on or about May 26, 2020, CRIT Police Department (PD) officers responded to a report of gunshots being fired in the Mo-Chem housing community located in Parker, Arizona.   When CRIT PD officers arrived at the location, they heard gunshots being fired from behind a residence.   CRIT PD officers approached the rear of the residence and made contact with a resident.   The rear kitchen door was open and officers heard two males discussing firearms.   As they approached the door, the officers observed Fisher and his brother (L.F.) standing next to two firearms that were placed on the counter.   Based on the investigation, it was determined that Fisher was in possession of the firearms and

---

[1] The case name Ryan Matthew Swick, a/k/a Ryan Matthew Fisher.   In the instant matter, Fisher identified himself as Ryan Matthew Fisher.

2

that he is a convicted felon.   The DNA standards requested in the proposed search warrant are to further confirm and/or corroborate Fisher's possession of firearm(s) by a convicted felon.

6.     On April 1, 2008, Fisher was convicted of 18 U.S.C. §§ 1153 and 113(a)(6), Assault Resulting in Serious Bodily Injury, a Class C Felony offense, and was sentenced to 27 months in the Bureau of Prisons.

7.     This affidavit is submitted in support of an application for a search warrant to obtain a deoxyribonucleic acid (DNA) standards (i.e., buccal swabs) from Fisher.   Fisher is an Indian male who is approximately 5'6" tall and weighs approximately 168 pounds.   Fisher has brown hair and brown eyes.   The last four numbers of Fisher's Social Security Number are 8886, and his date of birth is in 1988.   As of September 24, 2021, Fisher was in the custody of the United States Marshals Service and was being held at the Central Arizona Detention Center in Florence, Arizona in the District of Arizona.   Fisher and the things to be searched for and seized are more specifically described in Attachments A and B.

8.     The purpose of the proposed warrant is to obtain evidence pertaining to violations of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm, and 26 U.S.C. §§ 5861(d) and 5871, Possession of an Unregistered Weapon made from a Shotgun.

### Investigation

9.     You affiant was provided a report authored by CRIT PD Officer Daniel Martinez. The following information was obtained from the report.

3

a.     On March 26, 2020, at approximately 7:24 p.m., Officer Martinez was dispatched to the Mo-Chem housing community regarding a report of two to three gunshots being fired. Officer Martinez and Sergeant Jason Prichard arrived in the area at approximately 7:34 p.m., and Officer Martinez parked in front of a residence to listen. Shortly thereafter, Officer Martinez heard what he recognized to be a gunshot coming from behind one of the residences. Officer Martinez heard another shot being fired that seemed somewhat muffled, and it sounded like it originated from behind the same residence.

b.     Sergeant Prichard and Officer Martinez approached the residence from the northeast corner.   While outside the residence, Officer Martinez heard voices coming from the open rear kitchen door talking about firearms.

c.     A female resident then walked out of the residence, and she was identified with the initials T.E.   T.E. stood by the open door and the officers waited for the male individuals to come out of the residence. Officer Martinez observed broken glass bottles propped on the top of the chain link fence that appeared to be used for target practice.

d.     Sergeant Prichard attempted to make contact at the front door while Officer Martinez stayed at the corner of the house. Sergeant Prichard knocked on the door, and the officers heard children screaming but no one answered the door.

e.     The officers waited a little longer and then approached T.E. who appeared startled by the officers' presence.   Officer Martinez asked who else was

4

in the house with her.  T.E. said her children and her cousin.  T.E. appeared very intoxicated and displayed the following signs of intoxication: very strong slurred speech, blood shot watery eyes, and odor of alcohol emitting from her person. T.E. was hesitant and evasive when asked if the officers could speak with them.

    f.    Officer Martinez advised her that the officers were concerned that there were shots being fired from the residence.  T.E. denied gunshots coming from the residence.  Officer Martinez asked if the officers could speak with whoever was in the house.  T.E. said she would go speak with them.  Due to firearms being involved and not knowing who was inside and what their intentions were, the officers followed T.E. to the rear door and inside for their safety.

    g.    Officer Martinez observed two male subjects standing in the kitchen next to the counter, and Officer Martinez immediately observed two firearms on the counter.  One of the males, who Officer Martinez later identified as Fisher, was making a hand movement toward one of the firearms.  Officer Martinez ordered the two males to show their hands, and Fisher covered one of the firearms with clothes.

    h.    Next to where Fisher was standing was L.F., who was also standing next to a semi-automatic rifle on the counter. Fisher, L.F., and T.E were detained. Officer Martinez asked one of the male individuals what his name was. The male identified himself as Ryan Swick Fisher.

i.      Fisher, L.F., and T.E. were moved outside of the residence on the grass so Officer Martinez could secure the firearms for safety.

j.      The firearm that Fisher was standing next to was a .410-gauge shotgun, which appeared altered by the barrel being cut short.   It was loaded with one live .410 shotgun shell. The barrel was wrapped with black electrical tape and on the handle. On the barrel was an attached ammunition holder that had .410-gauge shells and .45 caliber rounds.

k.      The other firearm was a .40-caliber barrel rifle, and the barrel was folded back over the receiver. The .40-caliber magazine was loaded with 12 rounds.   Four expended .410-gauge shotgun shells were found. One was near the door way on the porch slab, and the other three were on the kitchen floor.

l.      Officer Martinez took photographs and secured the firearms in his patrol vehicle due to four children being present and playing in the living room. As Officer Martinez was securing the weapons in the rear of his patrol vehicle, he heard T.E. yelling.   Shortly thereafter, Sergeant Prichard advised that one of the subjects escaped on foot.

m.      Officer Martinez looked but did not notice anyone running. Sergeant Prichard then advised a Taser was deployed.   Officer Martinez ran around the corner of the house, and Sergeant Prichard advised that one of the male subjects (Fisher) had taken off.   Officer Martinez attempted to locate Fisher in the area but did not locate him.

6

n.      Officer Martinez returned to assist Sergeant Prichard.   L.F. was being held at Taser point, and Taser probes were still attached to L.F.'s skin. Sergeant Prichard advised he was assaulted by L.F. as he was trying to restrain T.E. from going inside the house. That was when Fisher had escaped around the house while in handcuffs.

o.      T.E. and L.F. were both arrested and charged with violations of the CRIT Tribal Code.   Officer Martinez attempted to locate the serial number for the .410-gauge handheld shotgun.   It appeared the serial had been attempted to be filed off, and two of the 8 numbers could not be identified.

10.      On June 19, 2020, your affiant received from CRIT Evidence Custodian Kendall Harper the following items that had been collected by CRIT PD: a Harrington & Richardson, Model Bay State, .410-gauge shotgun, with modified barrel and stock, and partially obliterated serial number (possible SN: 613669/618669); a Kel-Tec, Model SUB-2000, .40-caliber rifle, SN: FF6875; a Glock .40-caliber magazine; thirteen Winchester .410-gauge (live) shotguns shells; four Winchester .410-gauge shotguns shells (expended); nine Winchester .45 ACP rounds (live); twelve PMC .40-caliber S&W rounds (live); four Winchester .410-gauge shotgun shells (live); and one ammunition holder wrapped in black electrical tape.

11.      On June 30, 2020, Bureau of Alcohol Tobacco Firearm and Explosives (ATF) Special Agent Lowell Farley, an Interstate Nexus Expert, physically

examined the two firearms. SA Farley advised that the firearms were not manufactured in the State of Arizona.   The firearms were received and or possessed in the state of Arizona, thus the firearm had been moved in or affected interstate commerce.   SA Farley also advised that the Harrington & Richardson, Model Bay State, .410-gauge shotgun, measured 21 inches overall, had a barrel of 13.5 inches in length, and had been modified to no longer be designed to be fired from the shoulder (as its shoulder stock has been cut down).   The firearm meets the definition of a firearm set forth in 26 U.S.C. § 5845(a)(2), it meets the criteria to be classified as a "Weapon Made from a Shotgun," and it must be registered in the National Firearms Registration and Transfer Record (NFRTR) as set forth in the provisions of the National Firearms Act of 1934 (NFA), Title 26, United States Code, Chapter 53.   The firearm has not been registered.

12.    On July 17, 2020, FBI SA Donald Ferreira interviewed the owner of Bass Tackle Master in Lake Havasu City, Arizona. The owner provided the following information: The owner had a current Federal Firearms License in which he purchased, traded, and sold firearms at his store location.   The owner advised that on May 22, 2020, an individual with the initials I.E., purchased the Kel-Tec Model SUB- 2000 bearing Serial number FF6875.

13.    On July 17, 2020, your affiant interviewed I.E., and he provided the following information:

8

a.      I.E. was asked about the Kel-Tec Model SUB-2000 .40-caliber rifle he purchased from Bass Tackle Master in Lake Havasu City, Arizona, on May 22, 2000.   I.E. confirmed he purchased the Kel-Tec at Bass Tackle Master.   I.E. advised that the firearm had been stolen from him.   I.E. stated that he filed a report with the CRIT PD a few weeks ago.   I.E. made the report about four days after he realized it was stolen.   When I.E. found it was stolen, he said he did not know what to do.   I.E. asked his father, who told him to contact CRIT PD.   I.E. stated that he had the firearm stored in a red duffel bag where he stays at the American Indian Church in Parker, Arizona.   When he went back to get it out, I.E. realized it had been taken.   I.E. was asked when the last time that he saw the firearm was.   I.E. stated the last time he saw the firearm was two days after he purchased it.   I.E. was advised that the firearm was recovered after a shooting incident only four days after he purchased it.

b.      I.E. was asked who knew he had the firearm between the time he purchased it and the last time he saw the firearm (two days later).   I.E. stated just three people saw the firearm. A female with the initials P.F. and his two uncles.

c.      I.E. stated that the day he purchased the firearm, he brought it home and contacted his uncles to show them the firearm.   I.E. knew that his uncles are interested in firearms.   I.E. was asked what his uncles names where.   I.E. stated that his uncles are L.F. and Fisher.

9

d.      After contacting L.F. and Fisher, they told him to come to a residence in Mo-Chem where they were at.   I.E. brought the firearm and met L.F. and Fisher at the residence.   I.E. showed the firearm to L.F. and Fisher, and both L.F. and Fisher picked up the firearm and were handling it.   I.E. stated that he fired the firearm that day before putting the firearm in the red duffel bag where he stays at the American Indian Church.

e.      I.E. was told that the firearm was found in the vicinity of L.F. and Fisher during a shooting incident.   I.E. was asked if he thought it was a coincidence that his uncles ended up with the firearm only four days after I.E. purchased it.   I.E. said that Fisher and L.F. know where he stays, that he keeps his belongings at the American Indian Church, and that his uncles have stayed there as well.

f.      I.E. was asked if he sold or gave Fisher or L.F. the firearm.   I.E. said he did not, and that he knew better than to sell the firearm to L.F. and Fisher because they are convicted felons.   I.E. also knew that L.F. had been arrested again.

14.      Your affiant sent the firearms to the FBI Laboratory requesting DNA examinations.   On September 23, 2020, your affiant received a report from the Laboratory advising that the firearms were swabbed for DNA.

a.      The swabbing of the textured areas of the Harrington & Richardson Model Bay State .410-gauge shotgun and the swabbing of the Velcro pieces and exposed Styrofoam from the ammunition holder contained DNA.   The

10

mixtures of DNA obtained from the items each contain male and female DNA and are suitable for comparison purposes.

      b.     The swabbing of textured areas of the Kel-Tec Model SUB-2000 .40-caliber rifle contained DNA. The mixture of DNA obtained from the item contains male DNA and is suitable for comparison purposes.

      15.     On September 14, 2020, your affiant and CRIT PD Criminal Investigator (CI) Charlie Solano interviewed Fisher at the CRIT Adult Detention Center in Parker, Arizona. Prior to the interview, Fisher was advised of his rights under Miranda and agreed to waive those rights.  Fisher provided the following information:

      a.     Fisher said he wanted to talk about what happened with his brother, L.F.  L.F.'s supervised release was violated.  Fisher said that the things they are trying to get L.F. for are wrong, and that L.F. was not there in the area. Fisher admitted that he himself was present, though.

      b.     Fisher heard that L.F. was being charged with the firearms and ammunition from the case in Mo-Chem, but none of the stuff belonged to him. Fisher said that if L.F. tries to admit to things like that, L.F. is going to do a lot of time because he is on federal probation and is an ex-felon.  Fisher said he is also a convicted felon.

      c.     Fisher said that he was going to get into a fight because an unknown person was threatening his friend who has the initials S.B.  So, Fisher

11

stayed at S.B.'s house for three days.   L.F. saw Fisher trying to fight the guy, and L.F. brought Fisher to his house.   Fisher told L.F. to stay out of the fight.

     d.     L.F. left the house and said he would be back.   When L.F. departed, Fisher saw the person drive by in a white car honking the horn.   Fisher already had one of the firearms, so he went outside and shot the firearm one time in the air in the back of house.   Fisher said that nothing happened, and the guy left.

     e.     L.F. did not know that Fisher had shot the firearm while L.F. was gone.   Fisher said that someone called the police and reported that L.F. was the one that shot the gun.   However, Fisher said he was the one who actually fired the gun.

     f.     Fisher was advised that two firearms were found during the incident.   Fisher said that one of the firearms, the .410-gauge shotgun, he had taken over to the house.   Fisher was asked if it was the one with the sawed off barrel and the electrical tape all around it. Fisher said yes.   Fisher was asked if he sawed off the barrel.   Fisher said no, and that is how it was given to him.

     g.     Fisher said he did not know where the firearm came from. Fisher did not know about the serial number being removed, and Fisher said that he did not pay attention to it.   Fisher said he actually took the firearm from S.B.'s house, and he believed that the firearm belonged to the unidentified person that he was going to fight.

     h.     On another occasion, Fisher had seen the person he was going to fight at a Circle K, and Fisher said he hit the person in the face.   Fisher said he went

12

outside and tried to fight the guy again.   According to Fisher, the guy declined to fight (and he also had family members with him).

        i.      Fisher was asked about the second firearm, which was the Kel-Tec Model SUB-2000 .40-caliber rifle.  Fisher said that the day of the incident described above – March 26, 2020 – was the very first day he had seen the second firearm.  Fisher said he had never even shot that firearm before.  Fisher said he did not know where the firearm came from.  Fisher said that the firearm was already at the house when he got there.

        j.      Fisher was advised that his nephew had told investigators that he had showed that same firearm to Fisher days before the incident.  Fisher asked if it was I.E.  Investigators confirmed it was.  Fisher said that he did shoot that firearm then, but he did not know it was the same firearm.  Fisher said that I.E. did show him the firearm, he picked up Fisher at the church, and they went to go shoot it.  I.E. wanted to show him that firearm and another one he bought.  It was the very first time I.E. shot the firearm, and Fisher shot it with I.E.

        k.      Fisher said he did not know that the second (Kel-Tec) firearm had been taken, and Fisher said he did not know how the firearm ended up at the house.  Investigators told Fisher that I.E. said he showed Fisher and L.F. the firearm.  Fisher said maybe it was at separate times. Fisher said that L.F. was not there when Fisher and I.E. shot the second firearm.

13

l.      Fisher said he took the shotgun to the house a couple days earlier and left it there.   Fisher was asked if the day of the incident, L.F. was touching the firearms.   Fisher said L.F. was not even there.   Fisher said he was wrapping up the firearms.   Fisher had wrapped one of them up, and he thinks he was wrapping the other one up when the police came in.   According to Fisher, L.F. had only been there about 10 minutes when the police arrived.   L.F. had just came from town with his aunt.   When they got back, Fisher took L.F. out back to explain what happened and they went inside.

m.      Fisher was asked about him escaping in handcuffs.   Fisher said he did not know what he was thinking.   Fisher said he was pretty sure he was drinking.   Fisher was asked how he ended up getting out of the handcuffs.   Fisher said he picked them.

16.     Your affiant obtained and reviewed the Judgment from Case Number CR 07-01109-002-PHX-MHM, dated April 21, 2008.   According to the judgment, Ryan Matthew Swick (a/k/a Fisher) was convicted of 18 U.S.C. §§ 1153 and 113(a)(6), Assault Resulting in Serious Bodily Injury, a Class C Felony offense, and was sentenced to 27 months in the Bureau of Prisons

**Things to Be Searched for and Seized**

17.     Based on your affiant's experience and training as a law enforcement officer, it is known that evidence or trace evidence such as skin cells, blood, hair (being DNA evidence), and fibers may be transferred and/or deposited to items used

14

by a suspect.  For example, such DNA evidence may be left on a weapon by its possessor when the item is handled.  While sometimes DNA evidence is clearly visible, it often requires observation and analysis by forensic technicians in a laboratory setting to detect, analyze, and/or compare.  Your affiant is aware that in order to compare DNA located on items of evidence to potential subjects, a known DNA standard for that subject is required for comparison.

18.     In this case, your affiant is seeking DNA evidence from Fisher in the form of buccal swabs (i.e., two swabs) taken from his cheek area inside of his mouth. Those swabs can then be compared to the DNA evidence collected during this investigation (i.e., DNA material collected on swabs from the firearms in question).

19.     The things to be searched for and seized from Fisher, who is further described in Attachment A, are specifically described in Attachment B.   It is anticipated that the search warrant will be executed at the Central Arizona Detention Center in Florence, Arizona in the District of Arizona.

## Conclusion

20.     Based upon your affiant's training, experience, and observations, your affiant submits that there is probable cause to believe that violations of federal law have occurred, and that there is evidence of those violations, specifically 18 U.S.C. § 922(g)(1) and 26 U.S.C. §§ 5861(d) and 5871, in the form of a DNA standards located in or on the body of Ryan Matthew Fisher, a/k/a Ryan Matthew Swick, as further described in Attachment A.

21.     Your affiant respectfully requests that a search warrant be issued for the things described in Attachment B.

22.     Your affiant anticipates that a copy of the warrant, once received, will be provided to Fisher's counsel prior to the execution of the search warrant.

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

Executed on: 9/28/2021

Elliott M. White
Special Agent, FBI

___X___     Sworn by Telephone

Date/Time: _____

# Camille D. Bibles

Digitally signed by
Camille D. Bibles
Date: 2021.09.28 13:26:55
-07'00'

Camille D. Bibles
United States Magistrate Judge

16